**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRIS PERNA, Plaintiff, | |
| v. | CIVIL ACTION NO. 05-4464 (JLL) |
| TOWNSHIP OF MONTCLAIR, et al., | **OPINION** |
| Defendants. | |

**LINARES**, District Judge.

Pending before this Court is Joseph Hartnett's and the Township of Montclair's (collectively, "Defendants") motion for summary judgment (Docket Entry No. 28) as to all counts. Plaintiff Chris Perna ("Plaintiff" or "Perna") has filed opposition, and the Court considers the motion on the papers pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Defendants' motion is **GRANTED**.

## I. Factual History

Plaintiff Chris Perna began her employment with the Township of Montclair (the "Township") in August of 1984 as a clerk in the Parks and Recreation Department. (Defs. SOF ¶ 1.) In 1987, she was transferred to the Township Law Department, where she began work as a legal secretary. (Id. ¶ 2.) Dating back to 1975, the Township Law Department was normally staffed by two attorneys and one secretary. (Id. ¶ 5.) The two attorneys consisted of the Township Attorney, who directed the operations of the Law Department, and the Assistant

Township Attorney. (Id.) In 2002, the Township Attorney was Robert Hoonhout, Esq. ("Hoonhut") and the Assistant Township Attorney was Richard Seltzer, Esq. ("Seltzer") (Id. ¶ 6.) In June 2002, Hoonhout resigned and relocated to Florida, and Seltzer became Acting Township Attorney. (Id.) No Assistant Township Attorney was hired, however, to fill Seltzer's original position. (Id.) Thus, from June 2002 until February 2005, the staff of the Law Department consisted only of Seltzer, as Acting Township Attorney, and Perna, as legal secretary. (Id.)

Between 2000 and 2003, however, the Township attorneys had attempted to reclassify Plaintiff's position to reflect the expanded duties that she performed. (Pl. SOF ¶ 12.) Hoonhout wrote a memo on May 28, 2002, to the Township Manager stating that Perna's duties had expanded and that she was performing at the level of a "managerial/confidential paralegal" and ought to be classified and paid accordingly. (Pl. Opp. Br., Certification of Nancy S. Martin ("Martin Cert."), Ex. G.) Then, on June 17, 2002, Seltzer wrote a letter to the Township Manager asking that they abolish the obsolete title of Legal Secretary and memorialize an accurate description of the increased role played by Plaintiff. (Id., Ex. E.) Finally, on June 16, 2003, Seltzer wrote another memo asking that the position of legal secretary be reclassified and moved from grade 12 to grade 13. (Id., Ex. F; Pl. SOF ¶ 15.)

Thus, though the parties disagree with respect to the scope and definition of Perna's overall duties, it is clear that her duties were varied and that they had increased over time. With respect to preparing motions and pleadings, for example, the attorney would give Perna a copy of the complaint in a matter with a handwritten "A" for "admit" and "D" for "deny." (Id. ¶ 4.) Perna would then prepare the caption and type "admit" or "deny" for the corresponding

paragraph of the Answer. (Id.) All in all, she performed at a high-enough level to receive positive letters from Seltzer and Hoonhut.

During Spring 2003, the Township began exploring reorganization options and various cost-reduction measures. (Id. ¶ 7.) In Spring 2003, the Township took the position that non-union employees who earned over $60,000 per year, such as Perna, would not be eligible for annual salary increases. (Id. ¶ 8.) The non-union Township employees responded by working with Local 1040 of the Communications Workers of America ("CWA") to form a union. (Id. ¶ 9.) Perna was involved in the CWA reorganizing effort. (Id. ¶ 10.) In fact, Plaintiff was voted the representative for her Township building. (Pl. SOF ¶ 8.)

On May 27, 2003, the CWA filed Representation Petition with the Public Employment Relations Commission ("PERC") and sought to become the certified negotiations representative for certain Township job titles, including the legal secretary position held by Perna. (Defs. SOF ¶ 11.) PERC is the state agency responsible for overseeing "representative elections" and matters related to the collective negotiations process involving public employees in the state of New Jersey. (Id. ¶ 12.) On August 7, 2003, PERC conducted the election at the Township's office. (Id. ¶ 13.) On August 15, 2003, PERC issued a "Certification of Representative" which confirmed that the CWA would represent the white-collar, non-supervisory, professional and non-professional Township employees. (Id. ¶ 14.)

On September 22, 2003, the CWA filed a "Clarification of Unit Petition" with PERC. (Id. ¶ 17.) A "Clarification of Unit Petition" may be filed by a union or a public employer to clarify or amend the job titles that are contained within a collective negotiations unit. (Id. ¶ 18.) In this particular Petition, the CWA sought to include two additional positions, the Director of

Nursing and the Director of Arts and Cultural Development, within the collective negotiations unit that was created following the August 2003 election. (Id. ¶ 19.)

On October 27, 2003, shortly after the filing of the "Clarification of Unit Petition," Joseph Hartnett was hired as the new Township Manager. (Id. ¶ 20.) The CWA proceeded to engage in "some bartering" with the Township and Hartnett to reach mutual agreement concerning the job titles that would be included in the union representation. (Id. ¶ 21.) Of particular note, Perna's job title of Legal Secretary had been included within the CWA's petition, even though the "Legal Secretary" is typically considered to be confidential and is normally excluded from a collective negotiations unit. (Id. ¶¶ 15-16.) About this time, in the Fall of 2003, Thomas Bruno ("Bruno"), the CWA's Union Representative, testified that he had several conversations with Hartnett about Plaintiff and her position being excluded from union membership. (Pl. SOF. ¶¶ 16, 18.) Bruno further testified that Hartnett discussed with him the fact that Plaintiff was looking for a promotion or change of title and that if she was removed from union representation perhaps this change could take place. (Id. ¶ 17.) Bruno then testified that he informed Plaintiff that the Township was "looking favorably" on her promotion request and that if Plaintiff was removed from the union, the reclassification of her job title would take place. (Id. ¶ 20.) At the same time, Bruno acknowledged that his memory of this discussion was "foggy" and that he had only a "foggy recollection" of it. (Martin Cert., Ex. C, Bruno Dep. 37:15-38:8.) As a result of a settlement reached between the two parties, the legal secretary position was removed from the titles represented by the CWA. (Id. ¶ 23.)

Upon commencing employment as Township Manager, Hartnett embarked on fulfilling his primary objective of reviewing Township operations and personnel to develop formal

recommendations regarding cost-control and improved delivery of public services. (Id. ¶ 24.) Eventually, upon Hartnett's assessment, the Township eliminated twelve positions. (Id. ¶ 25.) These positions were eliminated either by actual job elimination or by a failure to fill the job after the employee left due to retirement or resignation. (Id.) Hartnett also recommended creating, modifying, or realigning certain positions. The Township implemented Hartnett's recommendations in 2004, resulting in an overall savings of about $700,000 per year and the net reduction of eight positions. (Id. ¶ 27.)

In September 2004, the Township Council decided to conduct a search for a new Township Attorney. (Id. ¶ 28.) The job advertisement asked the applicants to submit a "proposed department structure and budget." (Id.) A number of applicants responded, including Alan G. Trembulak, Esq. ("Trembulak"). (Id. ¶ 29.) Trembulak was an attorney with substantial experience representing municipal and public entities and was qualified for the position. (Id.) At that time, the Township Law Department consisted of an Acting Township Attorney earning $74,881 and Perna, as legal secretary, earning $63,925, for a total Department salary expense of $138,806. (Id. ¶ 30.) In his cover letter and application, Trembulak proposed that the Law Department be restructured so that it could perform more professional legal services, as opposed to clerical and administrative functions, for about the same overall cost. (Id. ¶ 31.) In accordance with that proposal, Trembulak suggested that the office be reorganized to redirect salaries according to the following structure: (1) Township Attorney at $75,000; (2) Assistant Township Attorney at $37,500; and (3) Legal Secretary at $35,000. (Id. ¶ 32.) At the time that Trembulak made this proposal, he was not a Township employee. (Id. ¶ 33.) Additionally, in September 2004, Trembulak did not know about Perna's 2003 activity on behalf of the union.

(Id. ¶ 34.)

During October-November 2004, the Township Council interviewed prospective candidates for Township Attorney. (Id. ¶ 38.) The Township decided to hire Trembulak at an annual salary of $75,000 and he was appointed on February 1, 2005. (Id.) The Township also hired an Assistant Township Attorney, Cassandra Savoy, Esq., who was paid $45,000 per year, and who likewise began work on February 1, 2005. (Id.) Then, on April 13, 2005, Hartnett informed Perna that her position was being eliminated effective June 30, 2005. (Id. ¶ 39.) The Township had decided to adopt Trembulak's proposal and abolish her legal secretary position, which carried a full-time salary of $64,995, in place of a part-time employee at lower cost. (Id.)

On September 12, 2005, Perna filed a four-count Complaint asserting the following claims: (1) retaliation for petition to redress in violation of 42 U.S.C. § 1983; (2) failure to train in violation of 42 U.S.C. § 1983; (3) retaliation for freedom of association in violation of 42 U.S.C. § 1983; and (4) violation of the New Jersey Law Against Discrimination ("NJ LAD"), N.J.S.A. 10:5-1 et seq. Plaintiff filed these claims against two groups of defendants – the first consisting of the Council members of the Township of Montclair (Edward Remsen, Ted Mattox, Joyce R. Michealson, Gerald C. Tobin, Robin Schlager, Jerold Freier and Sandra Lang), and the second consisting of the Township of Montclair along with Township Manager Joseph M. Hartnett.

All defendants filed a motion to dismiss. On September 27, 2006, this Court allowed only the following two claims to proceed: (1) the § 1983 retaliation claim against Hartnett for violating Perna's First Amendment right to associate with the union; and (2) the § 1983 claim against the Township for municipal liability based upon Hartnett's decision to eliminate Perna's

position in violation of her first Amendment right to associate with the union. (Docket Entry No. 11 at 27-28.) All other claims were dismissed. (Id.) Presently before the Court is a motion for summary judgment on behalf of the remaining defendants – Hartnett and the Township – pursuant to Fed. R. Civ. P. 56.

## II. Standard

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings. See Celotex, 477 U.S. at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

## III. Analysis

### A. Retaliation Claim Against Hartnett

The Third Circuit has established a three-part test to analyze whether a public employee who alleges retaliation for exercise of her First Amendment rights has set forth a *prima facie* case. Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002); Czurlanis v. Albanese, 721 F.3d 98, 103 (3d Cir. 1983). First, the plaintiff must demonstrate that she engaged in a protected activity. Id. Next, the plaintiff must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action. Id. Finally, upon fulfillment of the first two prongs, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. Id. Defendants do not contest the first prong – they acknowledge for purposes of this motion that Plaintiff engaged in a protected activity. (Defs.' Br. 23.) Thus, the Court limits its analysis to the second and third parts of the Ambrose inquiry.

#### 1. Causation

With respect to the second prong, Plaintiff bears the burden of persuasion in proving that her association and activity on behalf of the union was a substantial or motivating factor causing the adverse employment action. The Third Circuit recently highlighted the importance of a vigorous analysis of this requirement, noting:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take.

Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007). The Court first looks at the issue of whether or not Hartnett knew of Plaintiff's union activities, then examines the temporal proximity between the protected activity and adverse employment action and finally analyzes in detail the specific evidence set forth by Plaintiff in support of the causation prong.

**a. Knowledge**

Defendants first focus on the knowledge component of a causation analysis – whether or not Hartnett knew that Plaintiff had engaged in union activities in Spring 2003. (Defs.' Br. 24-25.) Indeed, the absence of knowledge is enough to defeat a claim of retaliation. See, e.g., Ambrose, 303 F.3d at 493 ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."); Moore v. City of Phila., 461 F.3d 331, 351 (3d Cir. 2006) (stating that a plaintiff must prove knowledge to establish causation).

Plaintiff sets forth several factual statements upon which she claims that a reasonable fact-finder could conclude that Hartnett knew of her union-organizing activities. First, Perna testified that she was at a Fall 2003 meeting, attended by herself, Seltzer, Clyde Sweet, and Hartnett, during which Seltzer informed Hartnett that Perna had been in the union. (Defs. Br., Certification of Sandro Polledri ("Polledri Cert."), Exh. E ("Perna Dep.") 47-48.) Additionally, Perna testified that Hartnett often saw her speaking with CWA members in a common area at the municipal building where employees frequently congregate. (Id. at 51-53.) Finally, Perna testified that she believed Hartnett had received a list of employees elected to represent the Union. (Id. at 46.) Additionally, Bruno testified that he had several conversations with Hartnett about whether the legal secretary position – filled by Perna – should be excluded from the union.

(Martin Cert., Exh. C (Deposition of Thomas P. Bruno, Jr. ("Bruno Dep.") 16-18.)

Not all of Plaintiff's evidence with respect to Hartnett's knowledge is satisfactory to create a genuine issue of material fact. Her belief both that Hartnett saw her speaking with CWA employees in the municipal building and that he had receive a list of union representatives is speculation and of little probative value on a motion for summary judgment. Similarly, Bruno's testimony regarding his conversations with Hartnett indicates not that they discussed Perna's early-2003 union activity but rather that they discussed whether her position, as of the Fall of 2003, should be removed from union representation. Thus, the conversation is probative as to Hartnett's knowledge that Perna was in the union, but not that she had helped to organize it in the Spring of 2003.

However, Perna does adduce one piece of evidence sufficient to defeat summary judgment regarding knowledge. She testifies under oath that she attended a budget meeting during which the fact of her union activities was directly divulged to Hartnett. Hartnett, for his part, does not recall the remark and claims to have had no knowledge of Perna's union work. (Hartnett Cert. ¶¶ 11-16.) However, the Court is satisfied that Perna has presented a tangible piece of evidence sufficient to allow a trier of fact to conclude that Hartnett did indeed know of her 2003 union activities, even though he did not assume his Township Manager position until after her those activities had concluded.

**b. Temporal Proximity**

Mere knowledge, however, is insufficient to establish causation in a retaliation case. Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 654 (E.D. Pa. 2000). Rather, Plaintiff must still adduce evidence creating a genuine issue of material fact as to whether her union work

was a substantial factor bringing about her eventual termination. In this inquiry, the Third Circuit has observed that "temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive." Shaner v. Synthes, 204 F.3d 494, 504 (3d Cir. 2000). On the other hand, evidence of a long delay between the protected speech and the retaliatory conduct "tend[s] to undermine any inference of retaliatory motive and weaken the causal link." Ruiz v. Morris County Sheriff's Department, No. 05-1825, 2008 WL 2229851, at *2 (D.N.J. May 28, 2008). In this case, the CWA filed its Representation Petition on May 27, 2003. Perna's activities on behalf of the union occurred in the Spring of 2003, leading up to the filing of the Representation Petition. The Township did not terminate her, however, until June 30, 2005 (she received notice on April 13, 2005). The two-year gap in this case, therefore, is not "unusually suggestive" of retaliatory motive and in fact serves to weaken Perna's attempts at establishing a causal link.

Defendant also points to intervening activities that occurred during that two-year period that weaken Perna's arguments regarding causation. First, Hartnett did not assume the job of Township Manager until October 2003. While the Court has already identified an issue of material fact as to whether or not Hartnett knew of Perna's union activities, it is significant that even if he knew about them, he was not around while they were taking place. Moreover, Trembulak is the individual who recommended eliminating the legal secretary position when he applied for the Township Attorney position in September 2004. It is undisputed that Trembulak had no knowledge of Perna's union activities and therefore his submission of a reorganization plan in September 2004 is a significant intervening event.

**c. Other Evidence**

Plaintiff, in response, cites to three specific facts in support of her assertion that an issue of material fact exists with respect to the causation prong.[1] The Court addresses each fact in order. First, Plaintiff notes that Bruno confirmed the conversations that he had with Hartnett regarding Plaintiff's association with the union and argues that "this creates a significant inference that Plaintiff's union actions were the reason for her position elimination." (Opp. Br. 14.) In and of itself, Bruno's statements do not lend themselves to the inference that Plaintiff seeks. While his statements are probative of Hartnett's knowledge that Plaintiff was a member of the union, they are insufficient to create an inference that her association with the union substantially motivated her subsequent termination. Plaintiff's inference on this point requires a logical leap that simply is not presented by Bruno's testimony.

Next, Plaintiff argues that "Hartnett wanted Plaintiff out of the union when [sic] someone is a member of the Union and you want to terminate that position, there may be bumping and seniority procedures." (Opp. Br. 15.) This argument stems from Hartnett's deposition wherein he was asked the question: "Supposed you want to terminate, there might be bumping and seniority procedures, correct?" and he answered "correct." (Martin Cert., Exh. B ("Hartnett Dep.") 60:1-5.) Again, the substance of Hartnett's testimony – that an employee who is a member of a union might be entitled to "bumping and seniority procedures" could not lead a reasonable fact-finder to conclude that Plaintiff suffered retaliation as a result of her activities in

---

[1] The Court notes that Plaintiff's citation to Robb v. City of Phila., 733 F.2d 286, 295 (3d Cir. 1984) on this point is misplaced, as Robb involved Third Circuit review of a district court decision granting a motion to dismiss for failure to state a claim. (Opp. Br. 10.) Here, Defendants move for summary judgment, and therefore Plaintiff is not entitled to the benefit of simply pleading a "bare-bones" retaliation claim.

the union. Plaintiff's attempt to demonstrate causation by producing this one statement from Hartnett's deposition is unavailing.

Finally, Plaintiff presents the deposition testimony of Ted Mattox, a Township Council member at the time that Plaintiff's position was terminated. Plaintiff relies upon several excerpts from Mattox's testimony, as follows:

Q: What I'm trying to find out, Miss Perna, the claim she's making in this lawsuit is essentially that her – the township took an action against her by eliminating her position and that that decision was motivated by the fact that Miss Perna was involved in union activities. That's essentially what she's saying. Now, I want to know if you have any information to show that one way or another.

A: I think that was a part of it.

Q: Why do you believe that?

A: Because it was sort of bantered about in conversation with council.

Q: What was bantered about?

A: Chris was seeking to make this position union so that we couldn't go after her. Now, I think what is more compelling, why would an employee have to seek protection from her employer but that might not be the question you want to hear the answer to.

Q: You talked about this being, I think your words were bantered about. Can you tell me about that?

A: Well, it was discussed. I believe Richard Seltzer, while he was employed, said we should make sure Chris was able to continue working for the township and that

> she wasn't subjected to the whims of administrations that come and go.

(Martin Cert., Exh. B (Deposition of Ted Mattox ("Mattox Dep.") 103-104.) Thus, in referring to a meeting that took place in the Fall of 2004 (Id. at 108:13-16), Mattox claims that the issue of Perna's union activity was "bantered about." In explaining what he meant by bantered about, Mattox states that Seltzer, the Acting Township Attorney wanted Perna's position to be a union position. Mattox also notes that at that meeting Ed Remsen said "why do you want to create more union positions..." (Id. 106: 3–6.) Finally, Mattox stated at a later point in this deposition: "I believe Miss Perna's union activity sped up the downward spiral between the township's relationship and Chris Perna." (Id. at 111.)

Thus, Plaintiff relies upon Mattox's claim that Perna's union activities were "bantered about" in Council discussions and Mattox's belief that Perna's union activity "sped up the downward spiral between the township's relationship and Chris Perna" to substantiate her claim of causation. Taken individually or together, these statements do not demonstrate a genuine issue of material fact with respect to that claim. Mattox's unsupported detail about general bantering regarding Perna's job position at a Fall 2004 Council meeting does not create an issue of material fact as to whether her dismissal nearly one and a half years later (June 2005) was the result of her union activity in the Spring of 2003. Moreover, Mattox's subjective believe that Perna's union activity sped up the downward spiral between the town and Perna is unhelpful for two additional reasons. First, speeding up a "downward spiral" falls far short of constituting a "substantial or motivating factor" in a termination decision. Following Mattox's analogy, the

downward spiral had already commenced – Perna's activity simply accelerated it.[2] Additionally, Mattox cites to no evidence that Perna's union activity actually caused or motivated her subsequent dismissal. His downward spiral statement is his subjective belief about the events that transpired, and that belief in and of itself is not sufficient to sustain Plaintiff's burden, especially when other evidence, including that of temporal proximity, counsels against finding causation.

Thus, the Court finds that though Plaintiff has created an issue of material fact with respect to Hartnett's knowledge of her union activities, she fails to surmount her burden as to the issue of causation. The long two-year time lapse between protected activity and termination combined with a lack of probative evidence indicating or proving causation leads this Court to find for the Defendants on their motion for summary judgment.

**2. Elimination of position in absence of protected conduct**

Under this third prong of the retaliation analysis, the Third Circuit has stated as follows:

> Thus, even if a plaintiff shows that activity protected by the First Amendment was a "substantial factor" in her termination, the defendant may show that some other factor unrelated to the protected activity was the but-for cause of the termination. Of course, because the defendant bears the burdens of proof and persuasion on the third prong, to prevail at summary judgment on this prong the defendant must present reasonable evidence of such quality that no reasonable juror could conclude that the protected activity was the but-for cause of the termination.

Hill v. Scranton, 411 F.3d 118, 127 n.11 (3d Cir. 2005). Assuming arguendo that Plaintiff had survived summary judgment on the causation prong of the retaliation analysis, the Court finds no

---

[2] This issue is more properly addressed in the third prong of the analysis, where the acceleration of a downward spiral indicates that the activities underlying the downward spiral would have taken place regardless of the factors prompting acceleration.

genuine issue of material fact as to this last question. As set forth below, the facts overwhelmingly favor Defendants.

Hartnett was hired in October 2003 and his primary task was to control costs and improve delivery of public services. In that vein, his reorganization proposal was adopted in April 2004 and it resulted in a net loss of eight Township positions and an annual savings of $700,000. After Hartnett's initial cost-cutting and one and a half years after Perna's union activities, in September 2004, the Township Council began searching for a Township Attorney.

The job advertisement specifically asked applicants to submit a proposed department structure and budget. Trembulak, the candidate eventually hired to fill the position, submitted a recommendation proposing that the Law Department budget be reallocated. His proposal, eventually adopted, involved eliminating the full-time secretary position and directing much of that money to hiring an Assistant Township Attorney. The Township could then hire a cheaper part-time clerical employee to fill the secretarial position. When Trembulak submitted his application and budget proposal, he did not know that Perna had been involved in union activities in 2003. Thus, Trembulak – having no knowledge of Perna's prior union activities – sought to restructure the legal department to deliver more attorney services at a lower cost. This restructuring involved elimination of Perna's position. Regardless of whether Perna had or had not engaged in union activities in 2003, the evidence on this prong clearly indicates that Perna's salary and associated position are the reasons that she was terminated, not her union activity two years earlier.

Perna contests this final prong by disputing that financial reasons caused the Township to eliminate her position. (Opp. Br. 17.) In support, Perna offers the testimony of Ted Mattox, who

testified as follows:

> Q: In other words, from your standpoint as councilman, you did not see any budgetary benefits to the town by outsourcing the administrative work to Mr. Trembulak's private firm?
>
> A: Absolutely not, none whatsoever and given I want to make one other comment, not only did I not see any financial benefits, I saw it as a financial detriment given the number of hours that Mr. Trembulak was planning to funnel through his law firm without an assistant.

(Mattox Dep. 91-92.) Additionally, Mattox testified that several other individuals were hired at the same time that Perna was fired. (Id.) In tandem, Perna therefore offers these two Mattox data points – regarding cost-savings and additional hirings – as proof that the Township did not eliminate Perna's position for financial reasons. This logic, however, is flawed.

As Defendants correctly note, Mattox's comments regarding the financial implications of terminating Perna's position were made in the context of addressing a proposal to have Trembulak's law firm take on the Law Department's secretarial work and bill for that work at a pre-arranged hourly rate. That proposal was never implemented. Mattox's statements, therefore, accurately question whether the proposal to outsource work to Trembulak's law firm was a financially sound one but they do not implicate the legitimate financial reasons underpinning the eventual move to replace Perna with a part-time clerical employee performing at a lower salary.

Finally, the fact that other individuals were hired at certain salaries at the same time that Perna was fired does not create a genuine issue of material fact as to whether Perna would have been fired regardless of her union activities. The evidence is clear that Hartnett's overall plan

saved $700,000 and, more importantly, that Trembulak came to the Legal Department with a blank slate and proposed to eliminate a high-paying secretarial position in order to deliver more and better legal services at a lower cost. No reasonable trier of fact could conclude, upon the evidence presented, that Perna's 2003 activities were the but-for cause of her 2005 termination. Accordingly, Defendants' motion for summary judgment is granted.

**B. Qualified Immunity**

Qualified immunity shields state officials performing discretionary functions from suit for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 296 (1982)). Qualified immunity is not simply a defense to liability; it is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

A qualified immunity analysis involves a two-step process. First, the court must ask whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show that the conduct violated a constitutional right." Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001). If the facts, as alleged, demonstrate a constitutional violation, then the Court must ask whether the right asserted was "clearly established." Saucier, 533 U.S. at 201. Pursuant to the Supreme Court's recent decision in Pearson, courts are free to analyze the Saucier steps in any order. Pearson v. Callahan, 555 U.S. ----, 129 S. Ct. 808 (2009). However, "where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the burden of showing that the

defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). Only upon carrying this initial burden must the defendant then demonstrate "that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions." Id.

In this case, the Court has already found in favor of Defendant Hartnett on his motion for summary judgment on the merits. Thus, the Court declines to address his argument as to qualified immunity.

### C. Municipal Liability Against the Township

A public entity may only be held liable under § 1983 if the adverse personnel action was undertaken by an official who had "final policymaking authority" for the entity. City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). However, a public entity cannot be liable under § 1983 for the actions of one of its employees if that employee has not committed a constitutional violation. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

Having found in favor of Hartnett on the Section 1983 retaliation claim, this Court must also dismisses the claim for municipal liability against the Township.

## IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is granted and this matter is closed. An appropriate Order accompanies this Opinion.

Dated: August 26, 2009

/s/ Jose L. Linares
United States District Judge